IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R. Bruce McNew,                  :
              Appellant    :
                    :    No. 1425 C.D. 2016
           v.          :
                    :    Argued: May 2, 2017
Zoning Hearing Board of East    :
Marlborough Township          :
                    :
Joshua Cauffman and The Singer  :
Family Trust and East Marlborough  :
Township Board of Supervisors    :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE DAN PELLEGRINI, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                    FILED: July 20, 2017

R. Bruce McNew (McNew) appeals from the July 14, 2016 order of the Court of Common Pleas of Chester County (trial court), which, after reviewing the matter *de novo*, denied McNew's land use appeal and upheld the decision of the Zoning Hearing Board of East Marlborough Township (Board) granting Joshua Cauffman (Applicant) special exceptions to change a non-conforming use and sign to another non-conforming use and sign pursuant to the applicable provisions of the zoning ordinance.

## Background

Applicant is the equitable owner of property located at 1460 Embreeville Road, Kennett Square, Pennsylvania (Property). The Property is approximately two acres in size, situated in the Residential District—B portion of East Marlborough Township (Township), and has several outbuildings. At the time of the hearing, the legal owner of the Property was the Singer Family Trust, which owned Chester County Timber (CCT), a lawn and garden equipment repair and sales business. The Singer Family Trust operated CCT on the Property as a non-conforming use since the 1960s. (Board's Findings of Fact (F.F.) at 4-5, 9-10.)

Section 1901.A (Change of Non-conforming Use) of the Township's zoning ordinance (Ordinance) provides that the Board may grant a special exception to permit a non-conforming use to be changed to another non-conforming use upon a determination by the Board that the proposed new use will be less detrimental to its neighborhood and surrounding area than the use it is to replace. Somewhat similarly, section 1904.C (Non-conforming Signs) of the Ordinance states that the Board may permit a non-conforming sign to be changed or replaced upon application for a special exception. Applicant filed an application with the Board, seeking to change the current non-conforming use on the Property, i.e., a lawn and equipment repair and sales business, to another non-conforming use, namely a landscaping design company. Applicant also sought a special exception to change or replace a non-conforming sign on the Property to one that will advertise the proposed landscaping design company. (Board's F.F. at 7-8.)

The Board convened a hearing on July 28, 2014, at which Applicant testified and offered the following exhibits into evidence: his application, a written explanation of the current use and proposed use of the Property, comparisons of the

2

detrimental impacts from the current and proposed use of the Property, and photographs of the existing sign and diagrams of the proposed sign. At the hearing, the Board granted McNew, a property owner whose property lies adjacent to the Property, party status. (Board's F.F. at 2, 6.)

After receiving the evidence presented by Applicant, the Board made the following findings of fact:

11. The current use of the Property, as a year-round lawn mower equipment repair and sales shop serving both contractors and the general public, garners heavy traffic including trucks and tractor trailer traffic for parts and new equipment deliveries as well as general public traffic.

12. Applicant proposes to change the current non-conforming use to a landscape design company, referred to as "Green Roots," which would operate approximately ten (10) months out of the year and would provide off-site landscaping services.

13. The proposed landscape design company is seasonal in nature and thus will employ approximately five (5) full-time employees and approximately three (3) to five (5) part-time additional employees during the busier spring and summer seasons.

14. Due to the seasonal nature of landscaping, the proposed landscape design company will operate between the hours of 7:00 a.m. and 6:00 p.m. during the months of April through December, with fewer hours during the winter months.

15. The proposed landscape design company will receive only several deliveries a year, in comparison with the one (1) to two (2) deliveries a day received by the current non-conforming use on the Property.

16. The proposed landscape design company will provide for less traffic than the current non-conforming use as it would require only employee traffic in the morning to

3

retrieve the equipment, and in the evening to return equipment, as well as moderate customer traffic for landscape design meetings.

17. The proposed landscape design company will also provide for less noise than the current non-conforming use which requires the constant noise associated with lawn mower and small engines, power tools and blade sharpening. In comparison, the only noise attributable to the proposed design company will be that of trucks leaving and returning to the Property.

18. The proposed landscape company would require a small, outdoor landscape yard to store trees and mulch for upcoming jobs. Applicant proposes that the storage yard would be located behind a four-car garage currently situated on the Property.

19. The proposed storage yard would not be visible to neighboring properties nor would it be visible from the road.

20. Applicant will store his truck and small hand tools as well as pallets, mortar, seed, and other equipment and paraphernalia necessary for the landscaping business inside the existing buildings and garage on the Property.

21. Applicant does not plan to install any additional lighting on the Property.

22. The Property provides fifteen (15) to twenty (20) parking spots, which will sufficiently accommodate for parking of Applicant's five (5) work vehicles, as well as for employee parking.

23. In addition to the change in non-conforming use, Applicant seeks to change the current sign on the Property to one reflecting the name of the proposed landscaping design company.

24. The current sign measures approximately four (4) feet by six (6) feet. In contrast, the proposed sign will measure only four (4) feet by four (4) feet.

(Board's F.F. at 11-24.)

Based on these facts, the Board granted Applicant a special exception to operate his landscaping design company, Green Roots, and also a special exception to change the business sign presently on the Property. In granting this relief, the Board opined:

> [I]t is determined that Applicant has met the specific and general requirements of the [Ordinance]. The use sought will not adversely impact the adjacent properties or be detrimental to the public health, safety morals, and welfare of the Township. Applicant has demonstrated that he does not intend to alter much in regard to the current physical state of the Property. For example, Applicant does not intend to install outdoor lighting to the Property that would be intrusive to adjacent properties. Rather, those physical changes that Applicant does intend to make to the Property include the installation of minimum landscaping that will only act to make the Property more aesthetically pleasing. Indeed, the proposed use of the Property as a landscape design company will be less detrimental than its current use as it will operate fewer months out of the year, will provide for less customer and delivery traffic and will emit less noise than the current non-conforming use of the Property as a lawn and garden equipment repair and sales business. Applicant has further demonstrated that the Property will accommodate adequate parking arrangements for employees and customers.

(Board's decision at 7.)

Accordingly, the Board concluded that Applicant established his entitlement to the special exceptions and granted him the special exceptions "subject to the condition that the proposed use of the subject property shall be in conformance with the plans, specifications, testimony and evidence presented to the Board." *Id.* at 8.

5

McNew appealed the Board's decision to the trial court. Following a stipulation by the parties, the trial court entered an order dated April 1, 2015, wherein it directed the parties to supplement the record with deposition testimony from Applicant, the legal owners of the Property and/or their representatives, and, if necessary, the Township's Zoning Officer. In this order, the trial court also agreed to decide the matter *de novo*, specifically based on "the original hearing transcript and exhibits, and the additional deposition testimony (and any exhibits thereto) as submitted[.]" (Reproduced Record (R.R.) at 452a-53a.)

After taking depositions, the parties submitted briefs in support of their respective positions. Thereafter, by order and opinion dated July 14, 2016, the trial court denied McNew's appeal and upheld the Board's grant of two special exceptions to Applicant.

In its opinion, the trial court noted that pursuant to section 1005-A of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S. §11005-A,[1] it was obligated to make its own findings of fact based on the record below as supplemented by the additional evidence. In issuing its findings of fact, the trial court adopted and incorporated the Board's twenty-four findings and also rendered the following findings based upon the additional evidence presented via depositions:

> 25. Starting in the 1960s, the Property was used by John W. "Jack" Singer to operate a lawnmower and landscape equipment sales and repair shop known as [CCT], until Mr. Singer's death in February 2013.
>
> 26. CCT's daily business hours were 8:00 a.m. to 6:00 p.m. However, Mr. Singer regularly extended the hours to accommodate customers.

---

[1] Act of July 31, 1968, P.L. 805, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §11005-A.

6

27. When in full operation, CCT had an indoor showroom for the sale of various gardening equipment, and that equipment was also moved outside for display if weather permitted.

28. CCT owned and stored on the Property at least two tractors with front-end loaders, one with a seventeen (17) horsepower engine, another with a thirty-seven (37) horsepower engine and rear wheels four feet in height. CCT also owned a tractor with a 48-inch lawn mower, and trailers for transporting that equipment.

29. Woodpiles, various equipment, gardening and construction supplies, and other materials were stored around the property of CCT.

30. On any given day, CCT would see at least (30) customers, and the number of customers could hit one hundred (100) on a Saturday.

31. CCT had approximately five (5) full-time employees at its height. However, the economic recession and his own declining health forced Mr. Singer to lay off all employees except his daughter, Diane Thierry, in 2008.

32. At the time of the downsizing, CCT stopped servicing full-scale landscaping equipment and began repairing solely small and handheld devices.

33. Despite the downsizing, CCT stayed in continuous operation until Mr. Singer's death in 2013, and has continued limited operations up to the present.

34. As part of [Applicant's] proposed use, also known as "Green Roots," the following vehicles will be stored on the Property: two dump trucks, a "utility body" truck, [Applicant's] personal truck, a skid loader with a capacity of approximately one ton, and a trailer to transport the loader.

35. The trucks owned by [Applicant's] proposed business will often not be present at the Property at all, due to the

fact that the employees will drive the company vehicles home themselves and carpool directly to job sites.

36. At the deposition[s], both John Singer (son of Jack) and [Applicant] indicated on a map of the Property what portions thereof their respective businesses used or would use. CCT utilized far more of the Property than Green Roots intends to use.

(Trial court's F.F. at 25-36.)

The trial court also addressed in its opinion four general arguments, and their numerous subsidiaries, that McNew raised in his brief contending that Applicant was not entitled to the special exceptions. As an initial matter, the trial court correctly observed that, under the Ordinance, a special exception may be granted to change a non-conforming use that has not been abandoned to another non-conforming use when the new, proposed use – after considering a non-exhaustive list of factors such as traffic generated, nuisance characteristics (e.g., emission of noise, dust, and smoke), and the hours and manner of operation – will be less detrimental to its neighborhood and surrounding than the preexisting use. In virtually every conceivable aspect, McNew argued that Applicant failed to satisfy these criteria.

First, McNew asserted that a portion of the existing non-conforming use of the Property was abandoned, per section 1901.E of the Ordinance,[2] because CCT

---

[2] This section provides:

Whenever a Non-Conforming Use of land, premises, building or Structure, or any part or portion thereof, has been discontinued for a period of one year, such discontinuance shall be presumed to constitute an intention to abandon such use and any subsequent use of the property shall be in conformity with the provisions of this Ordinance.

Ordinance, §1901.E.

8

"downsized" its operations in 2008. The trial court disagreed. Citing case law for the proposition that mere reduction in activity does not constitute abandonment of a non-conforming use, the trial court determined that although CCT's operations were decreased in scope, no portion of the non-conforming use was abandoned. More particularly, the trial court concluded that "despite [the] lessened intensity, CCT remained in continuous operation, and the essential nature of the business did not change." (Trial court op. at 7.)

Next, McNew alleged that Applicant's proposed use of Green Roots will be more detrimental to the community than CCT's operations and therefore fails to satisfy the standard set forth in 1901.A of the Ordinance.[3] In this regard, McNew contended that Green Roots will have more employees, store more heavy equipment, enlarge the commercial display area, increase outdoor storage for supplies, operate

---

[3] This provision states:

> The regulations of this Article shall apply to existing lawful uses, Structures, Lots, and Signs which do not conform to the provisions of this Ordinance nor to the provisions of any subsequent amendment hereto . . . .
>
> A. Change of Use
>
> A Non-Conforming Use may be changed to another Non-Conforming Use by grant of Special Exception only upon determination by the Zoning Hearing Board, after Public Hearing, that the proposed new use will be less detrimental to its neighborhood and surrounding than is the use it is to replace. In determining relative detriment, the Zoning Hearing Board shall take into consideration, among other things; traffic generated; nuisance characteristics (such as emission of noise, dust and smoke); fire hazards; and hours and manner of operation.

Ordinance, §1901.A.

9

for longer hours, and result in additional outdoor lighting. McNew further contended that, in comparison to CCT's operations, Applicant's proposed use will garner more business, occupy a greater portion of the Property's area, and generate more noise, dust, and emissions. Relatedly, McNew argued that the proposed use is inconsistent with the Township's comprehensive zoning plan and alters the character and type of the surrounding community.

In rejecting these arguments, the trial court determined that Applicant's proposed use "will be less detrimental to its neighborhood and surrounding than is the use it is to replace." Ordinance, §1901.A. With respect to number of employees, the trial court found:

> [T]he court must consider the cumulative history of the current use, and CCT, when it was in full operation, had five employees performing their equipment repair services entirely upon the premises. While the proposed use does seek to bring more employees to the Property, the circumstances of those employees' activity on the Property would be fundamentally different. CCT's full-time employees spent the entire work day at the Property, while the employees of Green Roots will spend most of their working hours off site at various landscaping job locations, and only spending time on the Property itself to retrieve equipment, and prepare for the off-site projects.

(Trial court op. at 8.)

Regarding the issues that McNew had with the storage of equipment and the hours of operation of Applicant's proposed use, the trial court explained that these concerns were unfounded:

> The existing use stores a variety of smaller equipment on the Property, while the proposed use would store several pieces of larger equipment . . . . However, due to the nature of [Applicant's] business, the equipment stored at the Property would not actually be on the Property most of the

10

time, since it would be used at various landscaping job sites. This is in contrast to the current use, which, based upon the nature of [CCT's] business as a repair company, keeps most, if not all, of the equipment on the Property permanently . . . .

Both the current and proposed uses utilize the grounds of the Property to store supplies for their businesses. However, the proposed use would only use areas of the Property that are screened from public view by trees or the garage on the Property for outdoor storage. Moreover, the supplies that would be stored outside, namely mulch and trees to be planted at job sites, would be delivered to the Property only a few times per year. The current use, when it was operating at full capacity, required deliveries to the Property on a daily basis . . . .

The proposed use will open one hour before the current use; however, that does not mean that activity will commence at the Property at 7:00 a.m. The actual business operations of the proposed use take place off-site, at various landscaping jobs, and the employees participating in those jobs will take the company vehicles home for the evening and drive directly to a job site to commence work at the site at 7:00 a.m. The current use permits customers to come and go at any hour of daylight, and often requires that work continue at the Property until late at night.

(Trial court op. at 8-10.)

In terms of McNew's contentions related to the proposed use's appearance to the public, the trial court determined that Applicant's proposed use will have an "outdoor display of sample landscaping designs [that are] more aesthetically pleasing than CCT's indoor and outdoor exhibition of gardening equipment" and that "Green Roots will not have any dedicated retail space on the Property." *Id.* at 9. The trial court reiterated Finding of Fact No. 21, which states that Applicant "does not plan to install any additional lighting on the Property," and noted that any prospect of

11

Applicant adding a low-voltage LED business sign was speculative and subject to other regulations imposed by the Ordinance. *Id.* at 10-11.

In addition, the trial court addressed McNew's assertions pertaining to traffic, total surface area of the proposed use, and noise, dust, and emissions as follows:

> When it was in full operation, CCT was frequented by customers who came to the Property to have their lawn equipment fixed. Thirty or more customers would come to the Property every day during the warmer months, with up to a hundred customers on the weekends. These commercial customers generated a great deal of traffic on the roads surrounding the Property and on the Property itself. Moreover, to sustain this high influx of business, deliveries to the Property by both large and small vehicles were required almost daily during the summer months. However, the proposed use, the Green Roots landscaping company, is not a commercial establishment open to the public, but rather a hub for various landscaping contracts to be completed offsite. In and of itself, this difference in business purpose will reduce the Property's impact upon the surrounding neighborhood . . . .
>
> CCT used almost the entirety of the Property for its business. Significant portions of the Property were devoted to woodpiles and equipment storage. However, [Applicant] indicated that Green Roots would only use several, much smaller, areas of the Property for storage of mulch and other landscaping supplies. The proposed use will be less detrimental to the surrounding properties considering that a smaller footprint of the Property would actually be utilized on a regular basis . . . .
>
> CCT, as a landscape equipment repair company, would often test-run the various lawn equipment under repair at the Property. Such repairs would also sometimes require the use of power tools. This activity resulted in fairly frequent mechanical noise emanating from the Property. The frequent deliveries to the Property also resulted in

12

significant emissions. Green Roots would not be testing or repairing equipment on the Property, and would receive far fewer truck deliveries. The only noise from the Property under the proposed use would be caused by the various landscaping trucks departing and arriving for offsite jobs, which would only occur at certain points and not throughout the day.

*Id.* at 11-12.

Further, the trial court determined that granting Applicant special exceptions in this case was consistent with the Township's comprehensive zoning plan, will not substantially impair, alter, or detract from the neighborhood, and is suitable with respect to the traffic and highways in the area. *Id.* at 13-14.

Taking into consideration all these factors and considerations, and for all these reasons, the trial court concluded that the proposed nonconforming use will be less detrimental to its neighborhood and surrounding area than the preexisting use.

Finally, McNew argued in the alternative that if special exceptions were to be granted, conditions should be imposed pursuant to section 2109(7) of the Ordinance.[4] The trial court dismissed this contention as follows:

---

[4] This part of the Ordinance provides:

> In any instance where the Zoning Hearing Board is required to consider a request for Variance or Special Exception, the Zoning Hearing Board must determine that the following standards and criteria are met before granting the request:
>
> *        *        *
>
> 7. Conditions are being imposed on the grant of the request necessary to insure that the general purpose and intent of this Zoning Ordinance is complied with and that the use of the property adjacent to the area included in the proposed change or modification is adequately safeguarded with respect to harmonious design in buildings, aesthetics, planting, and its maintenance as a sight or sound screen,

**(Footnote continued on next page…)**

13

The conditions proposed by [McNew] do not find support in the record. Most of the requirements imposed by the conditions serve to unduly restrict the proposed use, such as limiting the number of vehicles and employees that may be present on the property. The outright prohibition of outdoor storage and loading is far more restrictive than necessary, especially since the current use of the Property, alleged by [McNew] to be less detrimental to the community than the proposed use, utilizes most of the Property for outdoor storage. Other conditions, such as restrictions on lighting and the business sign, are merely restatements of what [Applicant] has already agreed to restrict. For those reasons, the court will not impose any of the conditions requested by [McNew].

(Trial court op. at 15-16.)

Based upon the above findings and legal reasoning, the trial court concluded, as a matter of law, that Applicant was entitled to the special exceptions. The trial court further concluded that the existing non-confirming use of the Property was not abandoned and the proposed non-conforming use is less detrimental to its neighborhood and surrounding than the existing non-conforming use. *Id.* at 16. In determining that no conditions are required to be imposed on the proposed non-conforming use, the trial court upheld the Board's decision with the understanding that Applicant is bound by all the representations he made to the Board with respect to the plans and specifications he submitted to the Board. Accordingly, the trial court denied McNew's land use appeal.

---

**(continued…)**

landscaping, hours of operation, lighting, numbers of persons involved, allied activities, ventilation, noise, sanitation, safety, smoke and fume control, and the minimizing of noxious, offensive, or hazardous elements.

Ordinance, §2109(7).

McNew filed a timely notice of appeal to this Court. The trial court then ordered McNew to file a Pa.R.A.P. 1925(b) statement, which he did. Instead of filing a Pa.R.A.P. 1925(a) opinion, the trial court referred to its July 14, 2016 order and opinion as disposing of all of McNew's assertions of error.

## Discussion

According to his appellate brief, McNew raises five issues for our review.[5]

In his first issue, McNew argues that the trial court committed an error of law in failing to find that the existing use was not partially abandoned because CCT discontinued a specific "portion" of its business, namely large equipment repair, and terminated five employees. For support, McNew highlights the phrase in the Ordinance, "or any part or portion thereof," and states that it expresses the Township's policy against eliminating or reducing non-conforming uses over time. Along these lines, McNew ultimately asserts that "the 2008 discontinuance of the large equipment repair business was an intentional abandonment of it, and the comparison of Applicant's new proposed use must be to [CCT's] most recent one-man (and his daughter) lawnmower and small equipment repair shop." (McNew's brief at 18.)

One way in which a lawful nonconforming can be abrogated or destroyed is if the property owner abandons the use. *Keystone Outdoor Advertising v. Department of Transportation*, 687 A.2d 47, 51 (Pa. Cmwlth. 1996). Here, as the

---

[5] Where, as here, the trial court takes additional evidence on the merits, it reviews the case *de novo*; this Court then reviews the trial court's findings of fact and legal conclusions for an error of law or abuse of discretion. *LHT Associates, LLC v. Township of Hampton*, 809 A.2d 1072, 1075 n.1 (Pa. Cmwlth. 2002).

15

party claiming the abandonment, McNew had the burden of proving abandonment. *Latrobe Speedway, Inc. v. Zoning Hearing Board of Unity Township*, 720 A.2d 127, 132 (Pa. 1998). To sustain this burden, McNew was required to show that: (1) CCT intended to abandon the non-conforming use of a lawn and garden business, (2) CCT actually abandoned the use. *Id.* As a general rule, the mere reduction in activity or use of the property does not constitute abandonment of a non-conforming use. *See Simonitis v. Zoning Hearing Board of Swoyersville Borough*, 865 A.2d 284, 289 (Pa. Cmwlth. 2005) ("The evidence relied upon by the trial court showed only a reduced use of the Property as a garage, but not an abandonment."); *Heichel v. Springfield Township Zoning Hearing Board*, 830 A.2d 1081, 1087 (Pa. Cmwlth. 2003) (concluding that no abandoned had occurred where "[n]o attempt was made by the Landowner to convert the property to some other use; no structures were demolished; no roads were removed; and no equipment was sold. The only change was in the volume of the inventory of abandoned cars, which is to be expected in a business of this type.").

Section 1901.E of the Ordinance reads:

> Whenever a Non-Conforming Use of land, premises, building or Structure, **or any part or portion thereof**, has been discontinued for a period of one year, such discontinuance shall be presumed to constitute an intention to abandon such use and any subsequent use of the property shall be in conformity with the provisions of this Ordinance.

Ordinance, §1901.E (emphasis added).

In construing the language of a zoning ordinance, this Court has said:

> The rules of statutory construction apply to ordinances as well as statutes. The interpretation of a statute or ordinance presents this Court with a pure question of law, which is generally subject to plenary review.

16

> The primary objective of statutory interpretation is to determine the intent of the enacting legislation. In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent and, thus, statutory construction begins with examination of the text itself. In reading the plain language of a statute, words and phrases shall be construed according to rules of grammar and according to their common and approved usage. With respect to zoning matters, undefined terms are given their plain meaning, and any doubt is resolved in favor of the landowner and the least restrictive use of the land.

*Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015) (internal citations and quotation marks omitted).

Upon examination, we agree with trial court that the general rule, i.e., that a reduced use of the property does not constitute abandonment of a non-conforming use, applies here. The trial court's finding of fact No. 32, which is supported by substantial evidence, states: "[a]t the time of the downsizing, CCT stopped servicing full-scale landscaping equipment and began repairing solely small and handheld devices." (F.F. at No. 32.) Obviously, CCT's transition from repairing heavy equipment to smaller equipment is a reduction in the intensity of the use, but the primary characteristic of the use – repairing equipment – has remained the same. We therefore conclude that, under prevailing case law, CCT did not abandon its use.

We also reject McNew's attempt to escape this conclusion by contending that the particular language of the Ordinance prohibits a reduction in a non-conforming use. In our view, McNew misinterprets the phrase, "or any part or portion thereof," and erroneously believes that it is conjoined grammatically with the scope of the actual non-conforming use. To the contrary, this phrase modifies the phrase immediately preceding it, "land, premises, building or Structure," and is clearly used to denote the situation where a non-conforming use is granted to a "part

17

or portion" of the land, premises, or structure; e.g., a swing-set in the lower-left corner of a backyard, a taxidermy shop in the cellar of a house, or a sign placed atop an unattached garage.

Indeed, this is the only logical interpretation of the Ordinance. If a non-conforming use could be subdivided or pared down, based upon inconsequential changes to the nature of the business, then an absurd result would occur and the use would, as a practical matter, be an ever-changing construct depending upon routine and ministerial business decisions. We think that common sense dictates that a use, in its general sense, is the only thing under the Ordinance that can be abandoned. So long as the use maintains its basic character, a specific part or portion of the use cannot be abandoned based upon minute changes or alterations in the way in which the use is effectuated, or, in other words, when there results a mere reduction in activity. There is a dramatic difference between a reduction in the scope of the use itself and the conversion of a use to an entirely new and distinct use. This case clearly evidences the former situation. Therefore, this Court concludes that McNew's first issue does not entitle him to relief.

In his second issue, McNew asserts that the trial court abused its discretion in determining that Applicant's proposed use will be less detrimental to its neighborhood and surrounding than the preexisting use. McNew merely restates the contentions he advanced to the trial court, specifically those related to the proposed use's number of employees, storage of heavy equipment, commercial display area, outdoor storage, hours of operation, outdoor lighting, and business sign.

Importantly, the trial court, proceeding in a *de novo* capacity, was the fact-finder, and, as such, the sole judge of the credibility of witnesses and the weight afforded their testimony. *See LHT Associates, LLC v. Township of Hampton*, 809

18

A.2d 1072, 1075 n.1 (Pa. Cmwlth. 2002); *DeCray v. Zoning Hearing Board of Upper Saucon Township*, 599 A.2d 286, 288 (Pa. Cmwlth. 1991). In the relevant parts of its opinion, reproduced above, the trial court ably and soundly rejected McNew's contentions, which, in overwhelming measure, attack the trial court's interpretation and assessment of the weight and credibility of the evidence.

For instance, despite the trial court's findings of fact, McNew calculates that "there would be as many as nine additional workers' vehicles, plus 'a few' vehicles of the office staff, for a total of twelve or more," (McNew's brief at 27); contends that "[o]utdoor storage of dump trucks and a heavy trailer are inconsistent with" the preexisting use, *id.* at 29;[6] asserts that "Applicant . . . plans to have a display area for plants on the Property [and] [t]here is no outdoor retail display area in [CCT's] business," *id.* at 30; maintains that Applicant's "outdoor storage represents a clear increase, not a reduction, of the very minimal outdoor storage that [CCT] had," *id.* at 32;[7] alleges that "[CCT's] hours of operation were from 8:00 a.m.

---

[6] *Cf.* Trial court op. at 8-9; *cf. also* F.F. at Nos. 11 ("The current use of the Property, as a year-round lawn mower equipment repair and sales shop serving both contractors and the general public, garners heavy traffic including trucks and tractor trailer traffic for parts and new equipment deliveries as well as general public traffic."); 28 ("CCT owned and stored on the Property at least two tractors with front-end loaders, one with a seventeen (17) horsepower engine, another with a thirty-seven (37) horsepower engine and rear wheels four feet in height. CCT also owned a tractor with a 48-inch lawn mower, and trailers for transporting that equipment."), *with* F.F at Nos. 12, 13, 22 ("The Property provides fifteen (15) to twenty (20) parking spots, which will sufficiently accommodate for parking of Applicant's five (5) work vehicles, as well as for employee parking."); 34 ("[T]he following vehicles will be stored on the Property: two dump trucks, a "utility body" truck, [Applicant's] personal truck, a skid loader with a capacity of approximately one ton, and a trailer to transport the loader."); 35 ("[Unlike CCT,] [t]he trucks owned by [Applicant's] proposed business will often not be present at the Property at all, due to the fact that the employees will drive the company vehicles home themselves and carpool directly to job sites.").

[7] *Cf.* F.F. at Nos. 18 ("The proposed landscape company would require a small, outdoor landscape yard to store trees and mulch for upcoming jobs. Applicant proposes that the storage **(Footnote continued on next page…)**

19

until 6:00 p.m. [while] Applicant proposes to start an hour earlier, at 7:00 a.m.," *id.* at 33-34;[8] and claims that Applicant's plans for "additional lighting is an increase, not a decrease, in the detriment to the residential neighborhood," *id.* at 35.[9]

In essence, McNew's arguments contradict – or at the very least, assume away – the trial court's factual findings and do nothing more than urge this Court to adopt his position, *see infra* nn. 6-9, which is something that our scope of review precludes us from doing. *See Polinsky v. Department of Transportation*, 569 A.2d 425, 428 (Pa. Cmwlth. 1990). Critically, McNew does not challenge any of the trial

---

**(continued…)**

yard would be located behind a four-car garage currently situated on the Property."); 19 ("The proposed storage yard would not be visible to neighboring properties nor would it be visible from the road."); 20 ("Applicant will store his truck and small hand tools as well as pallets, mortar, seed, and other equipment and paraphernalia necessary for the landscaping business inside the existing buildings and garage on the Property."); 27 ("When in full operation, CCT had an indoor showroom for the sale of various gardening equipment, and that equipment was also moved outside for display if weather permitted."); 29 ("Woodpiles, various equipment, gardening and construction supplies, and other materials were stored around the property of CCT.").

[8] *Cf.* F.F. at Nos. 26 ("CCT's daily business hours were 8:00 a.m. to 6:00 p.m. However, Mr. Singer regularly extended the hours to accommodate customers."); 30 ("On any given day, CCT would see at least (30) customers, and the number of customers could hit one hundred (100) on a Saturday."); Trial court op. at 10 ("The proposed use will open one hour before the current use; however, that does not mean that activity will commence at the Property at 7:00 a.m. The actual business operations of the proposed use take place off-site, at various landscaping jobs, and the employees participating in those jobs will take the company vehicles home for the evening and drive directly to a job site to commence work at the site at 7:00 a.m. The current use permits customers to come and go at any hour of daylight, and often requires that work continue at the Property until late at night.").

[9] *Cf.* F.F. at 21 ("Applicant does not plan to install any additional lighting on the Property.").

McNew also contends or, rather, presupposes, that Applicant will convert the sign into an illuminated one. However, Applicant did not obtain the necessary special exception to make this change.

court's findings that differ from or refute his own recitation of the facts on legal sufficiency grounds, and, as a result, the trial court's findings are "conclusive and may not be disregarded." *Id.* at n.2. Because McNew's brief narrates facts which are contrary to those found by the trial court, and he does not contest the factual findings that the trial court actually made, McNew has not proven that the trial court abused its discretion or committed legal error. *See Ductmate Industries, Inc. v. Unemployment Compensation Board of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

Further, based on our review, we conclude that the trial court's following legal conclusion is supported by the pertinent, unchallenged findings:

> [T]he proposed use . . . will be less detrimental than its current use as it will operate fewer months and hours out of the year, will provide for less customer and delivery traffic and will emit less noise than the current non-conforming use of the Property as a lawn and garden equipment repair and sales business.

(Trial court op. at 7.) Therefore, affording the trial court the appropriate deference it is entitled to as the fact-finder, and discerning no error of law flowing from the factual findings, we conclude that McNew's second issue fails.

In his third, fourth, and fifth issues, which we address conjunctively due to their overlapping nature, McNew posits that the trial court abused its discretion in failing to impose conditions when granting the special exceptions. More specifically, McNew contends that the trial court should have imposed conditions to guarantee that Applicant would conduct Green Roots in the manner that he testified to and in accordance with the findings of fact.

In addition, McNew asserts, cursorily and without any further elaboration, that it was necessary for the trial court to impose conditions related to planting, landscaping, hours of operation, manners of operation, lighting, number of

21

persons involved, traffic generated, and noise, dust, and other noxious or offensive elements. McNew further contends that the trial court should have attached a condition requiring Applicant to install screening to safeguard his property against unruly sights. Finally, McNew argues that the trial court should have imposed a condition prohibiting Applicant from installing additional lighting on the Property.

We disagree. "A [special] exception has its origin in the ordinance itself; it relates only to such situations as are expressly provided for and enunciated by the terms of the ordinance." *Timber Place Associates v. Plymouth Township Zoning Hearing Board*, 430 A.2d 403, 405 (Pa. Cmwlth. 1981). Contrary to McNew's overriding contention, when the Board granted Applicant the special exceptions, it did so "subject to the conditions contained in [its] Order," specifically "subject to the condition that the proposed use of the subject property shall be in conformance with the plans, specifications, testimony and evidence presented to the Board." (Board's decision at 8). The Board expressly found that "Applicant does not plan to install any additional lighting on the Property." (Board's F.F. at 21.)

As a practical matter, the Board imposed conditions upon Applicant and limited the scope of the proposed use consistent with the terms and sections of the Ordinance governing special exceptions and conditions. On appeal, the trial court upheld the Board's decision based on the understanding that Applicant is bound by the Board's conditions. (Trial court op. at 2, 10, 16.) Consequently, if Applicant conducts Green Roots in a manner that transcends his testimony or the parameters of the special exceptions, the Township may institute proceedings to revoke the special exceptions. *See Kulak v. Zoning Hearing Board*, 563 A.2d 978, 981-82 (Pa. Cmwlth. 1989) (stating that when a municipality imposes a condition, the municipality may "revoke the special exception, when compliance is not forthcoming or is

22

impossible."). On this note, the trial court did not err in failing to attach conditions to which Applicant has already agreed to follow and to which the Board has ordered Applicant to follow as a condition to the special exceptions.

Moreover, "although a municipal body may attach reasonable conditions in approving a special exception, the conditions must not be so onerous as to bar the use, and broad policy statements may not form the basis for such conditions." *Ethan-Michael, Inc. v. Board of Supervisors of Union Township*, 918 A.2d 203, 209 (Pa. Cmwlth. 2007). "Conditions must be reasonable and must find support in the record warranting the imposition of such conditions; otherwise, the imposition of conditions constitutes an abuse of discretion." *Coal Gas Recovery, LP v. Franklin Township Zoning Hearing Board, Greene County*, 944 A.2d 832, 839 (Pa. Cmwlth. 2008). Here, the trial court declined to impose any of the conditions that McNew requested above and beyond that which the Board ordered and Applicant agreed to follow. (Trial court op. at 16.)

To the extent, if any, that the above analysis does not dispose of McNew's contentions, we agree with the trial court's astute analysis and conclusion that the conditions proposed by McNew do not find support in the record and/or serve to unduly restrict Applicant's proposed use. *Id.* at 15-16. We further agree with the trial court and its uncontested findings that the proposed layout of Green Roots is more aesthetically pleasing than the existing use and, therefore, there is no need to impose a condition requiring that fencing be placed around the business. (Trial court op. at 9; *see* Board's decision at 5.) The attachment of conditions lies within the trial court's discretionary power, *see Coal Gas Recovery*, 944 A.2d at 839, and there is no credible evidence of record that would compel the trial court to impose the requested

23

conditions. Consequently, we conclude that McNew's remaining arguments lack merit.

## Conclusion

Upon our consideration of McNew's assertions of error, we cannot conclude that the trial court abused its discretion or committed an error of law when resolving the matter in a *de novo* capacity. As explained above, we conclude the trial court correctly determined that Applicant proved that he was entitled to the special exceptions; the existing non-conforming use of the Property was not abandoned; the proposed non-conforming use is less detrimental to its neighborhood and surrounding than the existing non-conforming use; and that no further conditions are required to be imposed on the special exceptions. Having made this conclusion, and unable to find any error on the part of the trial court, we decline McNew's request to upset the trial court's decision and we will instead affirm the trial court's July 14, 2016 order.

_____
PATRICIA A. McCULLOUGH, Judge

24

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R. Bruce McNew, :
               Appellant :
                     :   No.  1425 C.D. 2016
          v. :
                     :
Zoning Hearing Board of East :
Marlborough Township :
                     :
Joshua Cauffman and The Singer :
Family Trust and East Marlborough :
Township Board of Supervisors :

## *ORDER*

AND NOW, this 20th day of July, 2017, the July 14, 2016 order of the Court of Common Pleas of Chester County is hereby affirmed.

 

_____
PATRICIA A. McCULLOUGH, Judge